# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **CHARLES D. MISSEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:10-CV-02066-NAB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Charles D. Missey's ("Missey") application for disability

insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.* and

supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381*, et

seq.*.  Missey alleges physical disability due to diabetes, a torn right rotator cuff in his shoulder, a

left ankle impairment, and a right hip impairment.  The parties have consented to the jurisdiction

of the undersigned United States Magistrate Judge in this matter.  Because I find that the decision

denying benefits was supported by substantial evidence, I will enter judgment affirming that

decision pursuant to 28 U.S.C. § 636(c)(1).

## I.
## PROCEDURAL HISTORY AND
## FACTUAL BACKGROUND

Missey was born January 28, 1977.  He was 5 feet 8 inches tall and weighed 350 pounds

at the time of the hearing.  He completed the ninth grade, never received a general equivalency

diploma ("GED'), but received a Certified Nurses Assistant ("CNA") certificate in 2004 or 2005.

Despite vision problems, Missey is literate, can complete simple arithmetic, and look up

unfamiliar words in the dictionary.  (Tr. 24-26.)  He last worked in the fourth quarter of 2007 as a

caregiver.  (Tr. 30-32.)  He had been supported, up to the time of his hearing, by his girlfriend.

(Tr. 23-24.)

On September 12, 2006, Missey filed an application for a Period of Disability and

Disability Insurance Benefits and Supplemental Security Income payments.  (Tr. 113-20.)  The

Social Security Administration denied both claims, and a timely hearing request was filed.

Missey then appeared and testified at a hearing held on November 5, 2008.  (Tr. 17-66.)  The

Administrative Law Judge ("ALJ") issued a written decision on December 5, 2008 upholding the

denial of benefits.  (Tr. 5-16.)  On August 25, 2010, the Appeals Council for the Social Security

Administration denied Missey's request for review.  (Tr. 1-4.)  The ALJ's decision thus stands as

the final decision of the Commissioner.  Missey filed this appeal on July 23, 2010.

## Medical Records

On January 27, 2005, Missey was seen by Chris Hartigan, FNP-BC, at Great Mines

Health Center ("Great Mines"), with complaints of right hip pain, erectile dysfunction, and

difficulty sleeping, due primarily to his lower back pain.  Hartigan found Missey's range of

motion in his hip somewhat tender without popping, clicking or instability.  Missey also had

some greater trochanteric prominence tenderness and mild para lumbar musculoskeletal

tenderness.  Hartigan assessed Missey with chronic hip pain, low back pain, and erectile

dysfunction.  Hartigan planned physical therapy for Missey's hip, pain medication, monitoring,

and follow-up.  Missey's erectile dysfunction was controlled by medication.  (Tr. 266.)

On June 13, 2005, Missey was seen by Michael Singh, FNP-BC, at Great Mines with

complaints of shooting pains that began in his lower-left chest area, spread across his left chest,

and radiated into his left arm with numbness.  The pain also caused Missey to become dizzy on

2

occasion.  Missey reported that he initially experienced the pain every other day when he was

"out in the heat" or active.  He reported to Singh, however, that the pain had increased to five or

six times per day, even at rest, and that he experienced similar symptoms in the air-conditioned

health center.  Missey also reported experiencing cold sweats, dizziness, and a racing heart with

some of the episodes.  He denied any chest pain, shortness of breath, dizziness, or headache

during Singh's assessment.  Missey also indicated that he did not experience much improvement

in his neck pain while using Soma.  Singh assessed Missey with chest pain and planned an

exercise stress test, cardiology evaluation, a low-fat and low-cholesterol diet, a basic metabolic

panel test[1], a troponin test, and completed, but did not analyze the results of an electrocardiogram

("EKG").  Missey's extremity range of motion was within normal limits.  Singh also directed

Missey to go to the emergency room ("ER") if he experienced similar symptoms.  (Tr. 265.)

On January 19, 2006, Missey was admitted to Washington County Memorial Hospital's

("WC Memorial") ER by with complaints of left hip and lower back pain after he fell at home.

He also complained of shoulder pain, cramps and a ten-minute loss of feeling in his leg.  His

initial pain scale was between an eight and nine on a scale of one to ten.  He denied taking any

home medications.  Missey's medical history included right hip and left ankle surgeries.  (Tr.

252.)  Mohad Mojid, M.D., ordered an anterior-posterior pelvis x-ray.  Kenneth Miller, M.C.,

analyzed Missey's AP pelvis x-ray.  The x-ray revealed a "probable old fracture deformity" in

Missey's right hip with no acute fractures or dislocations.  (Tr. 256.)  Missey was diagnosed with

a muscular strain, prescribed pain medication, and discharged in good condition with no follow-

up recommended.  (Tr. 253-55.)  Missey is allergic to certain pain medications.  (Tr. 252.)

---

[1] A BMP is a blood test that measure glucose level, kidney function, and electrolyte and fluid
balance.

On May 14, 2006, Missey was admitted to WC Memorial ER with right shoulder pain as his chief complaint.  He had been experiencing the pain for two weeks before the visit.  An hour before his ER visit, Missey let his brother "pop" his shoulder.  Missey asserted that it felt like his muscles ripped.  He complained of a sharp, burning pain from the back to the front of his neck that extended under his arm.  He denied, however, any injury before having his shoulder "popped."  Missey took muscle relaxant for four days before the ER visit.  (Tr. 248.)  Dr. Mojid diagnosed Missey with a muscle strain, prescribed him Motrin 800mg, and discharged him in good condition with no recommended follow-up.  (Tr. 249-50.)

On June 9, 2006, Missey walked into the WC Memorial ER with complaints of right hip pain and headache following a car accident.  (Tr. 244.)  Missey did not have any lower back or pelvic pain.  Missey was diagnosed with a right hip sprain, prescribed Motrin 800mg, and discharged as improved and in good condition.  (Tr. 246-47).

On June 26, 2006, Missey followed-up on his June 9 emergency room visit.  He reported that pain in his right hip had improved, but the pain in his right shoulder was persistent.  Singh observed that Missey was unable to raise his right arm above his left shoulder pain-free.  Missy's shoulder was not swollen.  His range of motion in his lower bilateral and upper-left extremities was in normal limits.  Singh assessed Missey with right shoulder pain and recommended a plan of taking prescribed muscle relaxant, a physical therapy evaluation and treatment, exercise three to four times per week, a low-fat and low-cholesterol diet, and a follow-up after his physical therapy was completed.  (Tr. 264.)

On June 27, 2006, Missey began bi-weekly physical therapy at WC Memorial.  The sessions were to last four to six weeks and included physical exercise, inferential current ("IFC") treatment, cold packs, and ultrasound.  He only attended four sessions despite showing and

reporting improvement.  He attended his last physical therapy session July 14, 2006, and called

on July 27, 2006 to inform the hospital that he was seeing a chiropractor.  (Tr. 259.)

On July 17, 2006, James D. Robart Jr., D.C., of Robart Chiropractic Care Center began

treating Missey following a clinical evaluation.  (Tr. 275-78.)  Missey complained of constant,

severe, and sharp, shooting, stinging, throbbing pain with numbness, tingling, stiffness, soreness,

swelling, and weakness on both sides of his upper back.  (Tr. 279.)  Robart's clinical impression

was that Missey had a cervical sprain/strain, a thoracic sprain/strain, and rotator cuff/shoulder

syndrome in the peripheral joints.  (Tr. 277.)  Missey's home participation regimen was revised

to rest and ice.  (Tr. 279.)  Robart initially found signs of myospasm, inflammation, and

tenderness in Missey's entire upper cervical range.  (Tr. 275-78.)  Missey's symptoms, however,

improved with treatment, including spinal adjustments, cryotherapy, and IFC.  (Tr. 280-94.)  In

September 2006, Missey had a reduction in myospasm and tenderness by 60%, lessening of

inflammation by 70%, a 50% gain in mobility, a 70% increase in daily living functional

measures.  (Tr. 293.)  By October he had a normal range of motion in his extremities.  (Tr. 308.)

On September 5, 2006, Missey was admitted to the WC Memorial Hospital emergency

room with complaints of dizzy spells and headaches.  Missey had a computed tomography

("CT") scan, an EKG, and a glucose tolerance test.  Missey also requested and received a carotid

artery duplex exam.   He received medication and was discharged with follow-up instructions.

(Tr. 234-43).

On September 11, 2006, Missey attended a lab follow-up from his September 5, 2006

visit.  Missey was alert, oriented, and in no acute distress.  Singh assessed type-two diabetes

mellitus, right shoulder pain, and obesity.  Missey was instructed to obtain a glucometer,

maintain a log of blood sugars, maintain a low-fat, low-sodium American Diabetes Association

5

diet, follow-up with an orthopedist for right shoulder evaluation, and return to the office for a follow-up visit two weeks later.  (Tr. 263.)

On September 4, 2007, Missey sought treatment for left ankle pain with Sandra Klein, M.D., ("Dr. Klein") an orthopedic surgeon, at Jefferson Memorial Hospital ("Jefferson").  (Tr. 302.)  Dr. Klein's physical examination revealed that Missey was alert, in no acute distress, walked with a normal gait, had no significant swelling, and had full range of motion in his ankle. (Tr. 303).  Missey was also significantly tender to palpation over certain parts of his Achilles tendon.  An x-ray of his left foot was normal, except for evidence of pes plano valgus (flat foot or fallen arches), and some changes consistent with his prior surgery. (Tr. 304).  Dr. Klein opined that Missey's foot healed well from his prior surgery.  Dr. Klein concluded that Missey's biggest problem was his insertional Achilles tendinitis.  She advised a stretching program and prescribed anti-inflammatory medication.  Dr. Klein also scheduled physical therapy and instructed Plaintiff to follow up in six weeks.  (Tr. 303).

On September 5, 2007, Missey returned to Great Mines and was seen by his primary care physician, John Pearson, D.O. ("Pearson"), for sinusitis, coughing, nausea, fever, and other related symptoms.  (Tr. 307.)  He had also seen Dr. Pearson on January 22, 2007 for similar ailments.  Dr. Pearson's notes indicate that he was suffering from fatigue.  Missey's blood-sugar was stable, and he had full range of motion in his extremities.  Dr. Pearson recommended, among other things, for Missey to exercise three times per week, eat a low-fat, low-cholesterol diet, and prescribed cough suppressant, diuretic, allergy, and antibacterial medications.  (Tr. 308.)

On December 12, 2007, he was seen by Dr. Pearson for the flu, a new glucometer and refills of his medication.  His blood-sugar was above 300.  Missey was given diabetes testing

6

supplies and Dr. Pearson added high blood pressure medicine to his prescriptions.  (Tr. 306.)

In 2008, Missey saw Dr. Pearson between January 10 and October 21 for a variety of ailments, including bronchitis, restlessness, headaches, and nausea.  (Tr. 315-374, 377).  During this time, Pearson noted Missey had well controlled diabetes, high cholesterol, a previously documented talus fracture, a normal brain MRI, and obstructive sleep apnea.  (Tr. 316-45; 347-77).

On February 25, 2008, Missey left a message at Dr. Pearson's office explaining that he was nervous for a dentist's appointment and proffered that the dentist recommended Valium.  Dr. Pearson prescribed him the anti-anxiety medication.  (Tr. 317.)

On April 10, 2008, Missey's counsel requested an assessment of Plaintiff's impairments and functional limitations from Pearson.  Dr. Pearson completed the report in Missey's presence and with Missey's assistance.  Dr. Pearson diagnosed Missey with persistent fatigue, obesity, and chronic right hip pain.  Dr. Pearson listed Plaintiff's symptoms as fatigue, difficulty walking, leg cramping, general malaise, abdominal pain, depression, extremity pain/numbness, and hyper/hypoglycemia.  Dr. Pearson stated that Plaintiff could work about 30 minutes of sustained work during a typical workday.  Dr. Pearson opined that Missey could do repetitive and frequent lifting of twenty pounds and occasional lifting of fifty pounds.  (Tr. 313.)  Dr. Pearson further reported that Plaintiff could only stand or walk less than 2 hours and sit less than 6 hours (with normal breaks) in an eight hour day.  Dr. Pearson did not note any limitations, however, with reaching, handling, or fingering.  He determined Missey had unlimited ability to push and/or pull.

Dr. Pearson also concluded that Plaintiff's hip condition was degenerative and could be expected to remain that way or worsen in the next 12 months.  (Tr. 314.)

7

On April 11, 2008, Missey underwent a right hip x-ray that showed a healed fracture deformity.  (Tr. 336.)

On April 30, 2008, Missey phoned Dr. Pearson about a sinus infection and cough.  He also requested a prescription.  Dr. Pearson prescribed Plaintiff bronchitis medicine and directed him to use over-the-counter cough medicine.  (Tr. 374.)

On May 5, 2008, Missey's pain had improved without medication.  He had good blood pressure but doctors noted some chest pain and nausea.  He was obese, but with stable weight and degenerative joint disease.  (Tr. 373.)

On May 7, 2008, Missey underwent x-rays of his hip and pelvis which showed the superior joint hip to be well maintained.  (Tr. 335.)

On June 10, 2008, Missey visited Great Mines.  His chief complaint was that he needed his medication refilled.  He also reported dizziness.  Medical notes indicate that Missey's blood-sugar was less than 120 when he home-tested.  In-office testing showed his blood-sugar to be 129.  Doctor's notes indicate that Missey's diabetes was "well-controlled."  (327, 372.)

On June 30, 2008, Missey called Dr. Pearson requesting a prescription for headaches.  Dr. Pearson wrote him a prescription.  (Tr. 370.)

On July 1, 2008, Missey was seen by Dr. Pearson for a blood pressure check and recurring migraine headaches.  Missey requested a decongestant or blood pressure medication.  Dr. Pearson recommended over-the-counter decongestant twice daily.  (Tr. 367.)

On July 21, 2008, Missey failed to call or attend a doctor's appointment.  (Tr. 366.)

On August 4, 2008, Missey left Dr. Pearson a message with complaints of high blood pressure

and stated that he had been to the emergency room twice in a week.  There are no emergency room records in the file showing Missey visited in July or August of 2008.  He also wanted a prescription blood pressure machine.  (Tr. 365.)  Missey had several other minor interactions with Dr. Pearson throughout August of 2008.  (Tr. 362-64.)

In September of 2008, Missey reported headaches and vertigo.  (Tr. 339, 359, 382-84.) An MRI of Missey's brain was normal.  (Tr. 334.)  Missey also underwent a sleep study and was diagnosed with obstructive sleep apnea.  (Tr. 357, 337-38.)  On September 25, 2008, Missey sprained his ankle.  (Tr. 352.)

On October 8, 2008, an MRI of Missey's left foot showed a fracture of his left talus.  (Tr. 331-32.)

## II.

### EVIDENCE BEFORE THE ALJ

**A.**    **Testimony at the Hearing**

The ALJ held a hearing on November 5, 2008.  Missey was represented by counsel at the hearing.  Missey and vocational expert, Vincent Stock testified at the hearing.

**1.  Missey's Testimony**

Missey testified that he is 31 years old.  Missey has never served in the military or been to jail.  His girlfriend earns all of the household income and he has not worked since "November of '06." (Tr. 24-27.)

In 2007, Missey worked three hours during the morning using a ride on floor scrubber for a cleaning company.  (Tr. 27-28.)  He was terminated from the cleaning company in April or May of 2007.  In 2007, Missey also stated that he cooked and cleaned for two hours each day as a

caregiver for Disabled Citizens Alliance ("DCA").  (Tr. 29.)  He later worked as a caregiver for

Mr. William DeClue.  Missey mopped, vacuumed, and prepared meals for Mr. DeClue.  Missey

stated that he also performed janitorial work in 2007 for Work Smart Services. (Tr. 30-32.)

Missey testified that before 2007, he worked for several companies as a caregiver,

primarily cooking and cleaning for others.  (Tr. 33.)  As a caregiver, he was also responsible for

bathing and feeding the elderly in nursing homes.  When questioned about his length of time

working at nursing homes, Missey stated "I worked over three months."  (Tr. 34-35.)  Missey

stated that he was a cook for Hardee's for two months before beginning his work at nursing

homes.  He claimed that he was terminated because he "wasn't able to stand up and do [his]

duties."  (Tr. 36.)  Missey testified that he was fired from one nursing job and quit the other

because he "wasn't able to stand to complete [his] duties."  (Tr. 35-36.)  Missey stated that he

was a gas attendant for three weeks before he worked as a nurse and a cook.  The ALJ, however,

found discrepancies in Missey's recollection of his work history.  Missey could not accurately

remember the sources of his income between 2001 and 2005.  (Tr. 36-37.)  He began to recall his

sources of income after he was shown a printed copy.  (Tr. 37-38.)  He then testified that he

started working in nursing homes after 2001 and also worked part-time with DCA because he

"was trying to find something [he] could actually do."  Missey denied doing any work in 2008

despite a limited wage report.  (Tr. 39-40.)

Missey testified that his disability is due to a "right hip femur epiphysis," which prevents

him from being able to stand for long periods of time.  He stated that he can stand "maybe 10, 15

minutes at a time" and can sit for "maybe 30 to 45 minutes" because he is jittery and he is

"constantly trying to get up and move."  (Tr. 41.)  Additionally, Missey testified that his ankle

has "a cracked talus bone and it's unrepairable."  He stated that he expected to receive a custom-

made brace for his ankle two weeks after the hearing.  Missey also testified that he suffered diabetes-induced fatigue despite taking diabetic medication.  His doctor instructed him to control his diet but was reluctant to put him on insulin because of his age.  Missey also stated that the partial right rotator cuff tear was inoperable.  (Tr. 42-43.)  Missey is right-hand dominant and testified that he could not move his right arm much or write for long periods of time because his hand would grow numb.  (Tr. 43-44.) He said that he could only lift his right arm "a little bit, not very high[,]" and demonstrated by lifting his arm straight out for the ALJ.  Missey testified that he could never lift his right arm above his head.  He also stated that he was restricted to lifting around 10 pounds with his right arm, and only 25 pounds total due to his hip.  (Tr. 44.)

The ALJ then showed Missey Dr. Pearson's report that stated Missey could lift up to 50 pounds.  Missey testified that he was present with Dr. Pearson when he wrote the report, but "didn't know what was on there."  (Tr. 45.)  Missey claimed that Dr. Pearson had recently changed the restrictions.  Missey agreed with the report's indication that he could "stand or walk less than two hours and sit in an eight-hour day less than six hours."  The ALJ responded, "Now, because you told me a few minutes ago that you could only sit and stand a few minutes, so, has that changed?"  Missey replied that he had "to be up and down all the time."  He also stated that medication controlled his high blood pressure.  (Tr. 46.)

Missey testified that on a "good day" he could get dressed, but not tie his shoes. He stated that sometimes he went to work with his girlfriend to get out of the house.  At other times he slept because he was usually tired.  Missey could drive and mowed an area the size of a basketball court with a riding lawn mower.  (Tr. 46-48.)  Additionally, Missey stated that he was diagnosed with sleep apnea and used a full-face continuous positive airway pressure ("CPAP") machine.  He used the CPAP at level 14, but claimed that his hip kept him awake.  (Tr. 49-50.)

11

He took both over-the-counter and prescription ibuprofen for the hip pain.  (Tr. 50-51.)  Missey traveled more than 100 miles from home as a passenger in a motor vehicle about eight months before the hearing.  His girlfriend did not allow him to help with chores but he frequently drove to go shopping.  (Tr. 51-52.)

Upon examination by his attorney, Missey testified that he was unable to stand long enough to walk to forty-five minutes to the store.  He further stated that 10 or 15 minutes was the maximum amount of time he was able to spend grocery shopping.  He testified that his use of the ride-on scrubber was limited to 10 minutes without rest.  (Tr. 53-54.)  Missey cited the 10-minute limitation as the grounds for his termination.  He also stated that he was terminated from other jobs because of his inability to do the work in the time specified.  (Tr. 54-55.)  Missey also testified that he did not review Dr. Pearson's answers to the questionnaire or give his input.  Missey further stated that his limitations changed following MRI and x-ray results. (Tr. 56-57.)

## 2.  Vincent Stock Testimony (Vocational Expert)

Vincent Stock, a Vocational Expert ("VE"), testified that Missey's work as a caregiver was classified at a medium level with a specific vocational preparation time ("SVP") of six.  The ALJ posed the following hypothetical to the VE:

> [A]ssume a hypothetical individual with claimant's education, training, and work experience at the time of AOD. Further assume the individual can occasionally lift 50 pounds, frequently lift 20.  Stand/walk two hours out of eight.  Sit six hours out of eight.  Limited additionally to occasional reaching overhead…. Could the individual perform the past work?

(Tr. 61.)  The VE testified that past relevant work would not be available to the person in the first hypothetical.  (Tr. 61-62.)  The VE, however, identified an unskilled, sedentary position as security guard monitor, cashier, and assembly line fabricator as the type of work the hypothetical

individual could perform.  The VE testified that those positions existed in significant numbers in the local, regional, and national economy.  (Tr. 62-63.)  The ALJ posed a second hypothetical to the VE:

> In addition to what I have already given you I want to add to that occasionally climb stairs/ramps. Never climb ropes, ladders, or scaffolds.  Balance, stooping, kneeling, crouching, occasionally.  Crawling never.  And again, that would still have the occasional reaching overhead that we had previously discussed.  Would the individual be able to do the jobs that you've discussed?

(Tr. 63.)  The VE testified in the affirmative.  The ALJ modified the last hypothetical to include all of the information of the previous hypothetical claimant with the exception that the individual would need a break every 30 minutes during the workday to sustain.  The VE testified that the third hypothetical claimant would not be able to sustain work with those exceptions.  Missey's attorney questioned the VE and inquired whether, assuming Missey was credible, that someone with his limitations would be able to perform any job in the national economy.  The VE answered in the negative.  (Tr. 63.)  The attorney asked whether an individual the same age, with the same education, work history as Missey, with restrictions including: frequent lifting of no more than 20 pounds, occasionally lifting no more than 50 pounds, could stand for less than two hours in an eight hour work day, could sit for less than six hours in an eight hour workday, had to take breaks every 30 minutes, and had the same ailments as Missey, would be able to perform any job in the national economy.  The VE answered in the negative.  (Tr. 64.)

### III.

### ALJ DECISION

The ALJ determined that Missey met the insured status requirement of the Social Security Act through December 31, 2012 and had not engaged in substantial gainful activity since June 9, 2006.  Additionally, the ALJ determined that Missey had severe impairments, including: obesity, obstructive sleep apnea, diabetes mellitus, the residual effects of a healed fracture of the right

femoral neck, the residual effects of a possible partial rotator cuff tear, and past ankle surgery. The ALJ concluded, however, that Missey did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (Tr. 10-11.)  The ALJ found Missey has the RFC to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c), except Missey would be limited to lifting 20 pounds frequently, standing/walking 2 hours in an 8 hour workday and sitting up to 6 hours in an 8 hour workday.  Missey could occasionally climb stairs and ramps, but never ropes, ladders or scaffolds; and could occasionally balance, stoop, kneel, and crouch, but never crawl. Additionally he is limited to occasional overhead reaching.  (Tr. 11-12.)

The ALJ determined that Missey was unable to perform his past relevant work but that considering Missey's age, education, work experience, and RFC, jobs exist in significant numbers in the regional and national economy that Missey could perform.  (Tr. 14-15.)  The ALJ thus concluded that Missey had not been under a disability, as defined by the Social Security Act, from June 9, 2006 through the date of his decision.  (Tr. 15.)

## IV.
## LEGAL STANDARDS

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Gowell v. Apfel*, 2542 F.3d 793, 796 (8th Cir. 2001).  Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion.  *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000).  As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, *id.*, or because the

14

court would have decided the case differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (quoting *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider

(1)     the credibility findings made by the Administrative Law Judge;

(2)     the education, background, work history, and age of the claimant;

(3)     the medical evidence from treating and consulting physicians;

(4)     the claimant's subjective complaints relating to exertional and non-exertional impairments;

(5)     any corroboration by third parties of the claimant's impairments; and

(6)     the testimony of vocational experts when required which is based upon a proper hypothetical question.

*Brand v. Secretary of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. § 42 U.S.C. 416(i)(1); § 42 U.S.C. 1382c(a)(3)(A); § 20 C.F.R. 404.1505(a); 20 C.F.R. 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities.  If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work.  If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy.  If not, the Commissioner declares the claimant disabled.  § 20 C.F.R. 404.1520; § 20 C.F.R. 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the claimant, even if it is uncorroborated by objective medical evidence.  *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984).  The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  *See, e.g., Battles v. Sullivan*, 992 F.2d 657, 660 (8th Cir. 1990).  In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency, and intensity of claimant's pain; (3) any precipitating or aggravating factors; (4) the claimant's

16

daily activities; (5) the dosage, effectiveness and side effects of any medication; and (6) the claimant's functional restrictions.

*Id*. at 1322.

# V.
# DISCUSSION

Missey raises one point of error in arguing that the ALJ's decision is not supported by substantial evidence. Missey claims that the ALJ erred in failing to grant substantial weight to the medical opinions contained in a Physician Statement completed by Missey's treating physician, Dr. Pearson.

Generally, a treating physician's opinion is given controlling weight, but is not inherently entitled to it. *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006). A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole." *Leckenby v. Astrue*, 459 F.3d 626, 632 (8th Cir. 2007). A treating physician's opinion will be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p; *see also Hacker*, 459 F.3d at 937. An ALJ may discount or disregard a treating physician's opinion where other medical assessments in the record are supported by better or more thorough medical evidence, *see Rogers v. Chater,* 118 F.3d 600, 602 (8th Cir. 1997), or where a treating physician renders inconsistent opinions, *see Cruze v. Chater,* 85 F.3d 1320, 1324-25 (8th Cir. 1996); *see also Hacker*, 459 F.3d at 937 ("A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions.") (citation omitted).

When a treating physician's opinion is given controlling weight, the ALJ defers to the treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the

17

impairment, and the resulting restrictions.  20 C.F.R. 404.1527(a)(2); *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005).  "A medical source opinion that an applicant is 'disabled' or 'unable to work,' however, involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." *Ellis*, 392 F.3d at 994; *see also* 20 C.F.R. § 404.1527(e).  "Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." *Prosch v. Apfel,* 201 F.3d 1010, 1013 (8th Cir. 2000) (citing 20 C.F.R § 404.1527(d)(2)); *see also* SSR 96-2p.

Dr. Pearson's April 10, 2008 Physician Statement indicates that Missey is restricted in lifting, standing, walking, and sitting, and that his degenerative hip condition was expected to remain the same or worsen within the twelve months following the date of the report.  (Tr. 313-14.)  Dr. Pearson also opined that Missey could only perform "about 30 min[utes] [of] sustained work" before needing a break.  *Id.*[2]  The ALJ gave Dr. Pearson's opinion "less than controlling weight" because he found Dr. Pearson's opinion to be "inconsistent with the medical evidence as a whole and inconsistent with his own treatment records."  (Tr. 13.)

The Eighth Circuit has consistently upheld an ALJ's decision to discount a treating source's opinion where the opinion contains restrictions or limitations that are not mentioned in the source's treatment notes or records on the claimant.  In *Choate v. Barnhart*, the Eighth Circuit, citing a lack of limitations in the doctor's treatment records, upheld the ALJ's decision to discredit a medical source statement that indicated the claimant could sit and stand only for certain time periods.  457 F.3d 865, 870-71 (8th Cir. 2006).  Similarly, in *Ellis v. Barnhart*, the court upheld the ALJ's decision to discredit a doctor's opinion that the claimant was limited in

---

[2] Missey contends that the weight given to Dr. Pearson's opinion is "paramount" to the determination in this case because the vocational expert testified that the need to take breaks every thirty minutes made Missey unemployable.

his abilities sit and stand beyond a certain time period.  392 F.3d 988, 995 (8th Cir. 2005).  The court noted that the doctor "never ordered or even suggested to [the claimant] that he limit the time he stood or sat, nor did [the claimant] ever suggest to [the doctor] that he was unable to stand or sit for any length of time."  *Id.*; s*ee also Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2005).

Here, the record contains treatment notes from Dr. Pearson from January of 2008 through October of 2008.  None of the treatment notes, however, before or after April 10, 2008, the date of the Physician Statement, contain any mention of leg cramping, general malaise, depression or any limitations regarding standing, sitting, or walking.  *See* (Tr. 347-77.)  Dr. Pearson's documentation of these symptoms appears only in the April 10, 2008 Physician Statement, which was completed for Missey's attorney.  Dr. Pearson also noted in the Physician Statement that Plaintiff experiences fatigue, but Dr. Pearson's records never explicitly identify fatigue as a problem for Missey.  In a September 9, 2008 treatment note, Missey reported inappropriate daytime sleep.  (Tr. 359).  Beyond this note, Dr. Pearson never indicated that Missey experienced any medically significant fatigue.  Dr. Pearson's records include numerous telephone message sheets that reflect Missey's complaints and symptoms.  These message sheets also do not complaints from Missey regarding fatigue, leg cramping, general malaise, depression, or difficulty standing, sitting or walking.  *See Id.*

Similarly, Dr. Pearson does not mention any symptoms related to Missey's ability to lift until April 10, 2008.  In a treatment note dated April 10, 2008, the same day as the Physician Statement, Dr. Pearson indicated that Missey reported some "periumbilical pain" after some recent lifting and bending.  (Tr. 377.)  Dr. Pearson did not suggest any further evaluation or treatment for this issue and he did not order or suggest to Missey that he limit bending or lifting,

19

*see Ellis*, 392 F.3d at 995, and treatment notes and phone messages after April 10, 2008 contain no reference to any problems related to bending or lifting.

Dr. Pearson's treatment notes contain some references to chronic hip pain.  The record establishes that Missey has had hip problems since at least 2003.[3]  *See* (Tr. 269).  Dr. Pearson's notes, however, do not reference any hip problems until April 10, 2008, the same day he issued the Physician Statement, and Dr. Pearson's treatment records contain only one other reference to a hip condition after that date.  *See* (Tr. 313, 373, 377).  Neither Dr. Pearson, nor any other doctor, ever ordered or suggested that Missey limit his activities of lifting, sitting, standing, or walking because of the hip condition.  *See Ellis*, 392 F.3d at 995.  Further, there is no evidence in the record to suggest that any doctor, other than Dr. Pearson, considered Missey's hip condition degenerative.  Dr. Pearson's opinion that Missey's hip condition is degenerative does not appear to be based on any medically acceptable clinical and laboratory diagnostic techniques.  *See* 20 C.F.R. § 404.1527(d)(2); SSR 96-2p; *see also Hacker*, 459 F.3d at 937.  The Court also notes that Dr. Sandra Klein, an orthopedic specialist who examined Plaintiff for left ankle pain in September of 2007, did not note that Missey had or complained of any hip problems.  Dr. Klein noted Missey's history of hip surgery, but failed to mention any hip-related problems after a full evaluation.  In fact, she noted that Missey walked with a normal gait.  (Tr. 302-03.)

The Court acknowledges that some of the restrictions identified by Dr. Pearson have support in his treatment notes and elsewhere in the record.  Dr. Pearson, however, never mentioned many, if not most of the findings contained in his opinion before he completed the Physician Statement at the request of Missey's attorney.  Further, Dr. Pearson's report was

---

[3] Evidence in the record suggests that Missey had hip surgery, but no medical records confirm this.  *See* (Tr. 41) (Missey's hearing testimony); (Tr. 248) (Prior hip surgery listed in past medical history section of a medical record); (Tr. 302) (Hip surgery listed in past surgical history section of medical record).

prepared, "in the presence of and with the assistance of the patient." (Tr. 314.) Missey was found to be less than credible by the ALJ. Dr. Pearson's report, therefore, was rendered less credible. *See McCoy v. Astrue*, 648 f.3D 605, 617 (Physician's evaluation based, at least in part, on patient's self-reported symptoms rendered less credible insofar as patient's reported symptoms were found to be less than credible).

It must also be noted that the ALJ did not completely disregard Dr. Pearson's opinion. In fact, as Missey notes in his brief, the ALJ's "very similar" RFC finding shows that he gave "substantial weight" to Dr. Pearson's opinion. (Tr. 11-12.) *See* Pl.'s Br. at 13. The ALJ considered the residual effects of a healed fracture of Missey's femoral neck (hip) a severe impairment and imposed limitations on Missey's ability to stoop, kneel, crouch, and crawl. Furthermore, the RFC determination included a lifting limitation of no more than twenty pounds frequently, which is identical to that imposed by Dr. Pearson in his Physician Statement. *See* (Tr. 375).

Moreover, while Dr. Pearson found that Missey had no limitations with reaching, the ALJ found that Plaintiff was limited to occasional overhead reaching, a more restrictive physical limitation. Other substantial medical evidence also supports the ALJ's decision.

"Impairments that are controllable or amenable to treatment do not support a finding of disability." *Davidson v. Astrue*, 578 F.3d 838, 846 (8th Cir. 2009) (citing *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997). Dr. Robart determined that Plaintiff's response to chiropractic treatment substantially decreased myopasm, tenderness, soreness, inflammation and substantially increased Missey's mobility and daily living functional measures. (Tr. 279-93.) On October 26, 2006 and January 22, 2007, Singh opined that Missey had no edema and a normal range of motion in his extremities. (Tr. 308-09.) Following chiropractic treatment, Missy's self-reported

pain level on a visual analog scale of 0 to 10, with "0" being no pain and "10" being the worse

pain possible, decreased from "9" on his first visit on July 17, 2006, to "4" on September 28,

2006.  (Tr. 279-93.)  Missey also reported a subjective pain level as low as "3" during physical

therapy from a high of about "9."  (Tr. 259.)  In addition to the pain abatement, as of June 10, 2008,

Missey's diabetes was "well controlled," and his testimony that he was not using insulin and only

told to monitor his diet is supported by substantial medical evidence.  (TR. 42-43, 263, 327.)

    Because of these inconsistencies, and upon consideration of the medical record as a

whole, the Court finds that substantial evidence supports the ALJ's decision to not grant

controlling weight to Dr. Pearson's April 20, 2008 opinion.  *See Choate*, 457 F.3d at 870-71;

*Ellis*, 392 F.3d at 995; *Hogan*, 239 F.3d at 961.

## VI.

## CONCLUSION

    For the reasons set forth above, the Court  finds that substantial evidence on the record as

a whole supports the Commissioner's decision that Plaintiff is not disabled.

    Accordingly,

    **IT IS HEREBY ORDERED** that the relief sought by Plaintiff in his Complaint and

Brief in Support of Complaint be **DENIED** and that judgment be entered in favor of Defendant.

[Docs. 1, 17].

Dated this <u>29th</u> day of March, 2012.

        /s/ Nannette A. Baker
    NANNETTE A. BAKER
    UNITED STATES MAGISTRATE JUDGE